UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CARL McCLELLAND,

                              Petitioner,          **DECISION AND ORDER**
          -vs-                                      **No. 08-CV-0683(VEB)**

ROBERT KIRKPATRICK, Superintendent,
Wende Correctional Facility,

                              Respondent.
_____

## I.      Introduction

*Pro se* petitioner Carl McClelland ("McClelland" or "Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his custody following a judgment of conviction entered against him in Erie County Court, after a jury trial, on charges of second degree burglary, fifth degree criminal possession of stolen property, and possession of burglar's tools. McClelland is currently serving an indeterminate sentence of 20 years to life.

The parties have consented to final disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1). (Docket No. 9).

For the reasons that follow, McClelland's request for a writ of habeas corpus is denied and the petition is dismissed.

## II.     Factual Background and Procedural History

### A.      The Suppression Hearing

Testimony elicited at the suppression hearing revealed that at 5:00 a.m. on August 15,

2003, Buffalo Police Officer Ronald Ammerman was in his patrol car at Humboldt Parkway and Goulding in the city of Buffalo, when he saw a New York State Police cruiser coming toward him. (SH.8; numbers in parentheses preceded by "SH." refer to pages of the suppression hearing transcript). Officer Ammerman contemporaneously observed McClelland riding a bicycle in the street. It seemed to Officer Ammerman that McClelland was avoiding the trooper's car. As McClelland did so, he "made a jog" up into a driveway and almost fell off the bicycle. (SH.8). When the trooper's car passed by, Officer Ammerman approached Petitioner who was still in the driveway. He was "kind of juggling" two bags and trying to get back up on the bicycle. (SH.10).

Speaking to Petitioner from inside his patrol car, Officer Ammerman asked Petitioner how he was doing; Petitioner responded, "Good." When asked where he was going, Petitioner said he was headed home, explaining that he was coming from his daughter's house and that he was moving to a new residence. (SH.12). Thinking that it was "strange" that Petitioner was moving at 5:00 a.m., Officer Ammerman inquired of Petitioner what he had in the bags; Petitioner responded, "Oils." (SH.12). Officer Ammerman then asked Petitioner if he would mind if he looked in the bags. Petitioner said no, he would not mind, and handed the bags to Officer Ammerman. (SH.12).

Inside the bags Officer Ammerman found several bottles of perfume and cologne. When he asked Petitioner to name some of the perfumes in the bags, Petitioner responded, "CK One." However, there was no bottle of CK One in the bag. (SH.12). Asked to name another, Petitioner told Officer Ammerman that he could not because the officer was making him nervous. (SH.12). Petitioner then stated that the perfumes were his. He contradicted himself, though, saying that they belonged to his daughter. (SH.12). Officer Ammerman testified that during this

conversation, he remained inside his car; that Petitioner was free to leave; and that Petitioner

never said that he did not want to talk to him any further. (SH.13).

Based upon the contradictions in Petitioner's statements, Officer Ammerman got out of

his car and told Petitioner that if he had obtained the bags from an abandoned home, to tell him

(Officer Ammerman) and not waste his time.  (SH.14). Petitioner said that he had, but was

unable to give Officer Ammerman the location of the purported house. Petitioner was also unable

to give the officer his daughter's address, from which he claimed he had been moving. (SH.14).

While Officer Ammerman was talking to Petitioner, a man (later identified as Carl

DuBois ("DuBois"), the owner of 717 Humboldt Parkway) approached, pointed to the colognes

on the trunk of the patrol car and said, "Hey, that's my stuff, my house was burglarized."

(SH.15). Officer Ammerman recalled that DuBois stated that he had come home and found his

side windows broken and items missing from his home. Seeing the flashing lights on Officer

Ammerman's patrol car, DuBois had come to report the burglary. (SH.15-16).

After DuBois was able to identify the contents of the bags without looking inside them,

Petitioner was arrested and advised of his *Miranda* warnings which he acknowledged he

understood. (SH.17). At that time, Officer Ammerman told Petitioner to "make it easy on him"

and asked him to whom the property belonged. Petitioner nodded toward DuBois and DuBois's

wife, who were both standing nearby. (SH.18).

Officer Ammerman testified that while at the scene, a fellow police officer asked

Petitioner why he broke the window of the home. Petitioner denied doing so, stating that the door

was open and that he had "tapped it." (SH.19).

While being booked at the precinct, and overhearing that the charges would include

burglary, Petitioner responded that it would only be trespassing because he had not been caught inside. (SH.19).

Following the hearing, the trial court ruled that the tangible evidence would not be suppressed. The trial court further ruled that Petitioner's statements to the police would be admissible at trial.

### B.     The Trial

What follows is a brief summary of the evidence adduced by the prosecution at trial, which commenced on August 3, 2004.

Buffalo Police Officer Ronald Ammerman was on patrol in the vicinity of Humboldt Parkway and Goulding at 5:00 a.m. on August 15, 2003, when he observed McClelland riding a bicycle down Humboldt Parkway. T.101 (Numbers preceded by "T." refer to pages of the trial transcript.) As a New York State police vehicle approached, Petitioner made what appeared to Officer Ammerman to be a "furtive" movement into a nearby driveway in an attempt to avoid the trooper's car. T.101. Officer Ammerman pulled his car over to speak to McClelland who had two or three bags and was straddling the bicycle at the end of the driveway. T.104-105. Officer Ammerman asked McClelland his name, what  he was doing and where he was coming from and where he was headed. T.105. Petitioner provided his name and said that he was moving from his daughter's house. T.106.

In response to the officer's inquiry concerning the contents of the bags, Petitioner responded "Oils." T.106. When the officer asked if he could look inside the bags, McClelland acceded and handed the bags over. T.106. Officer Ammerman saw that the bags contained several bottles of cologne and perfume, as well as a flashlight and pair of gloves. T.106, 108.

Officer Ammerman recalled that he asked Petitioner to name one of the perfumes and Petitioner responded "CK One." Not finding any bottles of CK One in the bags, Officer Ammerman asked Petitioner to name another. Petitioner told him that he could not because Officer Ammerman was making him nervous. T.107. Noting the contradictions in petitioner's explanations, Officer Ammerman told Petitioner not to waste his time and to admit it if he had gotten the bags from an abandoned house. T.107. Petitioner stated that he had; however, he was unable to give the location or address of the house. T.107.

At this time, Officer Ammerman, believing that "defendant had stuff he shouldn't have," got out of his car to continue his conversation with Petitioner.  A man, later identified as Carl DuBois, approached Petitioner and Officer Ammerman. Pointing to the contents of the bags spread out on the trunk of the police car, DuBois announced, "That's my stuff." T.108-109. DuBois informed Officer Ammerman that his home had been burglarized. T.109.

After placing Petitioner under arrest and advising him of his *Miranda* rights, Officer Ammerman asked Petitioner the name of the person to whom the property. Petitioner nodded toward BuBois who was standing nearby and said, "Him." T.112. Officer Ammerman further testified that while Petitioner was being booked at police headquarters, he overheard Petitioner talking to the report technician concerning the burglary charge  to be filed. Petitioner told the report technician that it was not a burglary and that the charge would be reduced to trespass because he had "not been caught inside." T.113.

Toni DuBois ("Mrs. DuBois") testified that she owned and was living at 717 Humboldt Parkway, a single family home, with her husband and two children on August 15, 2003. T.38. At some time between 6:00 and 6:30 p.m., Mrs. DuBois and her family left to go to their

rental property at 30 Sweet Street where they were performing repairs in preparation for a housing inspection. T.39-40. Mrs. DuBois locked the doors and windows at 717 Humboldt and turned on the security system. T.51. Mrs. DuBois finished working on the rental property the next morning and left there some time between 4:50 and 5:00 a.m. for the ten-minute ride home. T. 42. Upon their arrival at 717 Humboldt, DuBois dropped his wife off and went to park the car. Mrs. DuBois heard her burglar alarm blaring, and noticed that the side window on her front door was broken. T.43-44. The front door was open and the lights were on in the house. T.43. Mrs. DuBois turned around and went to find her husband to tell him of her discovery. She further testified that she reminded him of the police car they had seen on the corner while coming home, and told him to go and report the burglary. T.46.

Mrs. DuBois, upon entering the house, found it "ransacked, items all over the floor, papers everywhere and stuff missing." T.46. A Wal-Mart bag containing her son's school clothes, an iron and other items, which she had left by the front door earlier that night, was missing. T.46.  As she walked through the house, Mrs. DuBois discovered that other property was missing. She identified People's Exhibit 1 as her daughter's bag which the police returned to her, and recalled that the police recovered two jewelry boxes, a camera, an iron and several bottles of perfume and cologne. T.48-49. Several other items which were missing were never recovered. T.51.

Carl DuBois' testified that after his wife alerted him to the burglary, he walked to the corner and approached the police car where the officer was talking to a man at the rear of the car. T.73-74. DuBois recalled that he saw his wife's bag (People's Exhibit 1) on the trunk of the police car along with other items including his Louis Vuitton belt, an iron, and several bottles of

cologne. T.75. DuBois recalled that he had received a phone call from a friend who said that he had been to his home at 717 Humboldt Parkway looking for him at 12:30 a.m., at which time, the friend told him, the alarm had not been sounding. T.84.

### B.     Verdict and Sentencing

The jury returned a verdict convicting McClelland as charged in the indictment. Based upon McClelland's recidivist status as a persistent felony offender under New York Penal Law § 70.10, the trial court sentenced him on November 12, 2004, to the maximum allowable term–25 years to life.

### C.     The C.P.L. § 440.10 Motion

While McClelland's appeal was pending before Appellate Division, Fourth Department, of New York State Supreme Court, McClelland filed a *pro se* motion for *vacatur* in the trial court on July 14, 2006, asserting, *inter alia*, that trial counsel was ineffective in failing to provide effective representation at the suppression hearing. The trial judge summarized McClelland's allegations as follows: (1) prior to the suppression hearing, he informed trial counsel that he had been handcuffed, searched, and placed in the police vehicle prior to Officer Ammerman having searched through the two bags Petitioner was carrying on his bicycle handlebars; (2) Petitioner requested that trial counsel move to re-open the suppression hearing after bringing to counsel's attention (a) the contents of a Buffalo Police Department document entitled "Calls-For-Service Inquiry Response" and (b) the misdemeanor criminal information signed by Officer Wendy Collier, Officer Ammerman's partner, which had been turned over to the defense during discovery.

McClelland argued that the "Calls-For-Service Inquiry Response", in which the officers

reported that DuBois identified the stolen items at 5:23 a.m., demonstrated that the officers

arrested him prior to learning that the property was stolen. According to the misdemeanor

information filled out by Officer Collier, the "gloves were recovered in the defendants [sic] left

rear pants pocket", which contradicted Officer Ammerman's testimony that he found the gloves

and a flashlight in one of the bags. McClelland concluded that trial counsel should have moved

to re-open the suppression hearing and used the Calls-For-Service Inquiry Response, the

misdemeanor information, and Officer Collier's expected testimony to establish that the police

did not have probable cause to arrest McClelland at the time the bags and the gloves were seized.

As to trial counsel's performance at the hearing, the trial judge found that trial counsel

"fully cross-examined Officer Ammerman with regard to the initial stop of the defendant and the

sequence of the event that followed, attempting to show that Ammerman's recollection was

faulty, and that defendant was actually arrested and placed in the police vehicle prior to the

victim's identifying the property." C.P.L. § 440.10 Order at p. 3. Trial counsel furthermore made

appropriate arguments at the conclusion of the hearing urging the suppression of the seized

property and McClelland's statements as the fruits of an unlawful stop. The trial judge concluded

that "counsel effectively represented defendant at the suppression hearing (*People v. Baldi*, 54

N.Y.2d 137)." *Id.*

With regard to counsel's failure to move to re-open the suppression hearing, the trial

judge found that there was "no merit" to McClelland's assertion of error:

> The allegation that the bags and the burglar's tools were seized prior to the police
> having probable cause to arrest is made solely by the defendant and not supported
> by the exhibits. Neither the Inquiry Response From [sic] nor the misdemeanor
> information are availing. . . . The Inquiry Response does not contain any notation
> to the effect that defendant was arrested prior to the victim's identification of the

property at 5:23 A.M. The misdemeanor information states that the gloves were found in defendant's left rear pants pocket, contradicting Officer Ammerman's testimony that the gloves were found in one of the bags. However, even if Ammerman's testimony were inaccurate, the misdemeanor complaint does not exclude the possibility that the gloves were seized incident to a lawful arrest. Based upon this analysis, there was no viable basis for a motion to re-open the suppression hearing.

C.P.L. § 440.10 Motion at pp. 3-4.[1]

With regard to trial counsel's alleged failure to inform McClelland that if he were convicted of second degree burglary he could be receive an enhanced sentence with a maximum term of life imprisonment, the trial judge found that it was "belied by the record wherein the possibility of his being sentenced as a persistent violent felony offender and the mandatory sentence range therefore were discussed." C.P.L. § 440.10 Motion at p. 4.

Finally, the trial judge found to be a matter of record McClelland's allegation that trial counsel erroneously failed to "challenge the denial of suppression because the court did not set forth findings of fact, conclusions of law and the reasons for its determination . . . ." *Id.* The trial judge dismissed both claims because the Appellate Division was "in a position to review both the

---

[1]    New York's Criminal Procedure Law provides as follows with regard to the re-opening of suppression motions :

> If after a pre-trial determination and denial of the motion the court is satisfied, upon a showing by the defendant, that additional pertinent facts have been discovered by the defendant which he could not have discovered with reasonable diligence before the determination of the motion, it may permit him to renew the motion before trial or, if such was not possible owing to the time of the discovery of the alleged new facts, during trial.

N.Y. Crim. Proc. § 710.40(4). "In applying this procedural rule, New York law employs a general presumption that a defendant 'know[s] the circumstances of his or her own arrest and therefore is capable of eliciting evidence of those circumstances at a pretrial hearing.'" *Greaves v. Brown*, No. 06 CV 3524(ARR), 2007 WL 1232077, at *5 (E.D.N.Y. Apr. 26, 2007) (unpublished opn.) (quoting *People v. Velez*, 829 N.Y.S.2d 209, 2007 N.Y.App. Div. LEXIS 1455, at *9 (App. Div. 2d Dept. Feb. 6, 2007) (collecting cases) (finding that trial court should have reopened suppression hearing since defendant offered new facts beyond the scope of his knowledge of the circumstances of his arrest)).

determination itself and counsel's failure to object." *Id.*

### D.     The Direct Appeal

Represented by new counsel, McClelland presented three issues for review on direct appeal: the suppression motion was erroneously denied; the sentence was harsh and excessive; and the verdict for second degree burglary was against the weight of the evidence. On December 22, 2006, the Appellate Division affirmed the judgment of conviction but modified the sentence.

The Appellate Division extensively reviewed the suppression issue and concluded that the trial court properly denied those parts of McClelland's suppression motion seeking to suppress physical evidence and his statements to the police. *People v. Willie White, a/k/a, Carl McClelland*, 35 A.D.3d 1263, 1264 (App. Div. 4th Dept. 2006). To validate a stop under the common-law "power to inquire," the reviewing court must examine the knowledge possessed by the police officer at the given moment and any reasonable inferences to be drawn from that knowledge. *E.g., People v. DeBour*, 40 N.Y.2d 210, 215 (N.Y. 1976).

The Appellate Division held that each stage of the encounter between Officer Ammerman and McClelland was justified under *DeBour*. 35 A.D.3d at 1264 (citing *People v. Bour*, 40 N.Y.2d at 215). That court implicitly rejected McClelland's contention that the initial encounter constituted a "stop" as contemplated by *Terry v. Ohio*, 392 U.S. 1 (1968); *People v. Cantor*, 36 N.Y.2d 106 (1975). Instead, it was the lowest level of police intrusion as enunciated in DeBour and its progeny–namely, a request for information which need only be justified by an "objective, credible reason not necessarily indicative of criminality." *People v. Ocasio*, 85 N.Y.2d 982, 985 (N.Y. 1995) (citing *People v. Hollman*, 79 N.Y.2d 181, 187, 194 (N.Y. 1992).

Thus, "[b]efore the police may stop a person pursuant to the common-law right to inquire

there must exist at that moment a founded suspicion that criminal activity is present. The police

may not justify a stop by a subsequently acquired suspicion resulting from the stop." *Id.* at 216

(internal citations omitted). The Appellate Division concluded that the observations of

McClelland riding a bicycle down the street at 5:00 a.m. and making furtive movements to avoid

a State Trooper vehicle "provided a founded suspicion that criminal activity was afoot and thus

justified the second level of intrusion" under *DeBour*, "i.e., a detention short of a forcible

seizure" for the purpose of obtaining "explanatory information." *People v. McClelland*, 35

A.D.3d at 1264 (citations omitted).

Petitioner had stopped in the driveway of his own accord prior to the officer's approach.

The officer did not get out of his car and chase Petitioner, draw his gun, direct Petitioner to stop,

or physically detain Petitioner in any way. This brief encounter, in which the officer elicited

Petitioner's name, where he was going and coming from and what he was doing, was not a

violent or forcible apprehension, and it did not interfere with Petitioner's liberty of movement.

See, People v DeBour at 216; People v Cantor at 106, 111; People v Bora, 83 N.Y.2d 531 (1994).

Under these circumstances, the prosecution argued, no "reasonable person would have believed

that he was not free to leave." *Florida v. Royer*, 460 U.S. 491, 502 (1983).

The Appellate Division concluded that the next level of intrusion under *DeBour* was

justified on the basis of McClelland's "inconsistent answers" and what happened when the police

officer, with McClelland's consent, looked into the bags: McClelland could not list the contents

of the bags, and a pair of gloves and a flashlight was found in one of them. The Appellate

Division concluded that these circumstances gave rise to a "reasonable suspicion" that

McClelland had committed a crime, thereby allowing the police to forcibly detain him. *People v.*

*McClelland*, 35 A.D.3d at 1264 (citing *People v. DeBour*, 40 N.Y.3d at 223). Petitioner, who was not in custody, freely and voluntarily gave his consent for the officer to look in the bags. See, People v Rogers, 259 A.D.2d 398 (1st Dept 1999), lv denied 93 N.Y.2d 1005 (common law inquiry including request to view contents of plastic bag defendant holding viewed lawful); People v Boyd, 91 A.D.2d 1045 (2nd Dept 1983) (officer's inquiry about contents of defendant's bag properly based on common law right to inquire). No gun was drawn and the officer's inquiries prior to the consent were brief and non-confrontational. Moreover, petitioner has a long history of contact with law enforcement authorities which is some indication that his consent was "more likely to be the product of calculation rather than awe." *People v Gonzalez*, 39 N.Y.2d 122 (1976); People v Ruiz, 188 A.D.2d 495 (2nd Dept 1992), lv denied 81 N.Y.2d 892. Notably, it was petitioner's own conduct that provided the officer with a reasonable suspicion of criminality. Petitioner's contradictions concerning the contents of the bag, who it belonged to and where he had gotten it, provided the officer with reasonable suspicion to believe that criminal activity was at hand.

The third and final level of acceptable intrusion under *DeBour* was justified once one of the burglary victims approached the police and McClelland and identified some of the stolen items as belonging to him. The Appellate Division found that this set of circumstances gave the police officer probable cause to arrest McClelland. *People v. McClelland*, 35 A.D.3d at 1264 (citing *People v. DeBour*, 40 N.Y.3d at 223).

In addition, the Appellate Division found that the verdict for second degree burglary was not against the weight of the evidence. Finding the 25-year-to-life sentence for second degree burglary was unduly harsh and severe, the Appellate Division reduced it in the interest of justice

under New York Criminal Procedure Law ("C.P.L.") § 470.15(6)(b) to an indeterminate term of 20 years to life

The New York Court of Appeals denied leave to appeal on April 9, 2007.

### E.    The Federal Habeas Proceeding

This timely Section 2254 habeas petition followed, in which McClelland raises the same three grounds for relief as he asserted on direct appeal. (Docket No. 1). Respondent answered the petition. (Docket Nos. 6 & 7). After Petitioner filed his reply memorandum of law (Docket No. 8), he also filed a request for a subpoena *duces tecum* (Docket No. 10) to obtain a copy of the call to 911 emergency services made in connection with the investigation into the crimes for which he was convicted. Petitioner's argument was based on his assertion that Officer Ammerman, the arresting officer did not learn of the burglary until *after* Petitioner was required to disclose the contents of two bags containing property stolen from the burglarized residence while detained at police headquarters. Petitioner also argued that he was required to make an incriminating statement prior to 5:23 a.m., the time when the burglary allegedly was reported to the police in the putative 911 call.

Magistrate Judge Foschio issued an order directing Respondent to respond to McClelland's request for the subpoena. (Docket No. 11).

Respondent's attorney filed an affidavit in opposition (Docket No. 12), pointing out that a habeas corpus petitioner is not entitled to discovery as a matter of course, *e.g.*, *Drake v Portuondo*, 321 F.3d 338, 346 (2d Cir. 2003) (citing *Bracy v. Gramley*, 520 U.S. 899 (1997)), and arguing that McClelland had not demonstrated the requisite good cause because he had not "set forth specific allegations that provide reason to believe that the petitioner may, if the facts

are fully developed, be able to demonstrate that he is . . . entitled to relief." *Defino v. Thomas*, 2003 WL 40502, at *4 (S.D.N.Y.2003).

Respondent also explained that no 911 call was placed with regard to the incident involving McClelland. As recounted above by this Court in its summary of the trial testimony, Petitioner was stopped and questioned by the police based on his "furtive" behavior.  During the questioning, the  homeowner (DuBois) who had arrived home to find his security alarm sounding, approached the police officer to report the burglary of his home. It was then that he saw items that had been taken from his home on the trunk of the patrol car. The homeowner testified that his alarm was not connected to a monitoring service or to the police department. *See* Respondent's Affidavit, ¶¶ 7, 8 (Docket No. 12). Respondent stated that the report setting forth the radio transmissions between the police officers who apprehended and transported Petitioner to headquarters and the police dispatcher was turned over to Petitioner's attorney under New York's criminal discovery statute codifying *People v. Rosario,* 9 N.Y.2d 286 (N.Y. 1961). In sum, Respondent argued, McClelland not only failed to show good cause for his request for a tape-recording of a 911 call, he failed to show such a tape existed. *Id.* (Docket No. 12).

In his reply affidavit (Docket No. 13), Petitioner argued if the 911 call transcript had been requested by his trial attorney, it would have confirmed his assertion that his arrest without probable cause commenced at an earlier point in time, and that the discrepancy between the arresting officer's testimony asserting the exact time of Petitioner's arrest, after one of the owners identified the property found in Petitioner's possession, would have created a serious issue of the officer's credibility causing the state court judge to agree with Petitioner's reconstruction of the time-line leading to his arrest. According to Petitioner, this would have

demonstrated that the discovery of the stolen property and Petitioner's statement were the fruits of Petitioner's unlawful detention and not based on reasonable suspicion or probable cause. Petitioner's Reply Affidavit, ¶ 12 (Docket No. 13). Petitioner further argued that this  alleged discrepancy would have resulted in his acquittal because it would also have undermined the credibility of the arresting officer's trial testimony directed to Petitioner's guilt. *Id*. (Docket No. 13). Petitioner contended that Respondent's assertion that the 911 transcript does not exist contradicted Petitioner's belief that his trial attorney had previously informed Petitioner that the tape of the 911 call did exist, and that his attorney had received a copy, but that the copy received by the attorney was "inaudible." *Id.*, ¶ 11 (Docket No. 11).

Alternatively, Petitioner requested a subpoena for a "CAD Report Transmission" and "the Dispatcher's Report Transmission" in order to demonstrate further inconsistencies between the arresting officer's testimony at the suppression hearing and trial regarding the specific investigative steps leading to Petitioner's arrest on the burglary charge. *Id.*, ¶ 16 (Docket No. 11). Petitioner did not further identify the requested CAD Report Transmission.

Magistrate Judge Foschio, in a very thorough decision and order (Docket No. 14), found that McClelland had not demonstrated "good cause" for his request for the alleged 911 tape-recording or transcripts. Magistrate Judge Foschio read Petitioner's motion as setting forth a belief that the 911 tape or transcripts might establish that the police learned of the reported burglary after Petitioner was physically detained in a police car near the place of the burglary without reasonable suspicion or probable cause, and that defense counsel's failure to pursue this ground for suppression demonstrates ineffective assistance of counsel at the suppression hearing conducted in Petitioner's case which resulted in an adverse ruling to Petitioner. *See McCalla v.*

*Greiner*, 378 F. Supp.2d 262, 271 n. 5 (W.D.N.Y. 2005) (ineffective assistance of counsel claim

based on Fourth Amendment suppression litigation not barred by *Stone v. Powell*) (citing

*Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)).

  However, according to Respondent, the underlying 911 tape or tapes do not exist.

Magistrate Judge Foschio explained that nothing in Petitioner's Reply Affidavit explained

"how defense counsel could have negated the arresting officer's testimony that Petitioner was

arrested and charged only after one of the victims arrived on foot at the police car where

Petitioner was being held, verbally reported that his home, a few doors away, had been

burglarized, and contemporaneously identified the contents of bags the police had observed

Petitioner had been carrying when he was stopped for questioning as stolen property which the

officers asserted Petitioner had consensually revealed during his encounter with the police."

Order at 4 (Docket No. 14).

  Judge Foschio explained that the trial court, in rejecting Petitioner's request for

post-conviction relief on the same ground, thoroughly considered defense counsel's efforts to

establish the same point that Petitioner's habeas claim hinges upon, i.e., that the court would

have disbelieved the arresting officers' recounting of the events leading to Petitioner's arrest, if

defense counsel had been more effective by cross-examining the officers using the 911

transcripts. *See* Memorandum and Order of Hon. Shirley Troutman, Erie County Court Judge,

dated December 22, 2006,  at pp. 2-3, attached as an exhibit to the Petition (Docket No. 1).

  Furthermore, Judge Foschio pointed out, Petitioner admitted he was arrested on an

outstanding Florida warrant at least ten minutes before the victim, DuBois, identified the stolen

property that Petitioner was carrying in a bag. Reply Affidavit ¶9 (Docket No. 13). Significantly,

Petitioner did not dispute the existence of the Florida warrant, which, Judge Foschio noted, provided an additional basis for Petitioner's detention until the police were informed of the burglary and the stolen property was identified. Order at 4 (Docket No. 14).

The Magistrate Judge determined that Petitioner's request for a copy of the so-called "CAD Report of Transmissions" between the arresting officers and the communications department,  referenced in Respondent's opposition affidavit, was not supported by "good cause" because those records were provided to defense counsel. Judge Foschio noted that Petitioner did not dispute Respondent's representation as to the production of these records and concluded that since the CAD Report of Transmissions had been previously provided to Petitioner, there was no ground for his request. However, if Petitioner advised the Court that he lacked a copy of the CAD Report of Transmissions, Judge Foschio requested that Respondent provide Petitioner with an additional copy, if Respondent reasonably could locate a copy in the Erie County District Attorney's files.

This case subsequently was reassigned from Judge Foschio to the undersigned. (Docket No. 15).

A little less than eight months after Judge Foschio's order denying the request for a subpoena *duces tecum*, McClelland filed a motion to compel discovery, claiming that the CAD Report of Transmissions with which he was provided in November 2010 by Respondent was "insufficient." He accordingly requested the "CAD print out from the original back-up tape." (Docket No. 16).  The Court issued a scheduling order directing Respondent to respond to the motion. (Docket No. 17).

Respondent's attorney filed an affidavit in opposition (Docket No. 18) noting that she had

reviewed the contents of Petitioner's file and found no such "CAD print out from the original back-up tape" contained therein.  Respondent's attorney did find a cassette tape which was attached to the CAD Report of Transmission. Respondent's attorney had the cassette tape converted to a compact disc which was manually filed with the Court on January 3, 2011. (Docket No. 19).

McClelland submitted two affidavits in response to Respondent's affidavit. (Docket Nos. 20 & 21). These are discussed further *infra* in Section III. As also discussed in Section III, *infra*, McClelland has not demonstrated good cause for the invocation of discovery procedures in his second Motion to Compel.

## III.    Motion to Compel Discovery

It is well established that "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Discovery is only permitted where the district court finds "good cause" to allow it. *See* Rule 6(a) of the Rules Governing Section 2254 Cases. Such good cause exists "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)).

By McClelland's own admission, his request for discovery in the second Motion to Compel is moot. In his first reply affidavit, submitted in response he stated he "must stubbornly concede" that "'the tape [defense] counsel showed him' at the Erie County Holding Center, and referred to as the 911 tape[,] was more than likely the CAD report from the original backup tape.

. . ."[2] He further admits that it was available to the defense well in advance of the suppression

hearing and trial. Thus, there can be no contention that any information was withheld from the

defense. The motion to compel accordingly is denied as moot.

In the second reply affidavit, McClelland changes tack and requests a "transcribed copy"

of the compact disc submitted by Respondent; as noted above, Respondent converted the cassette

tape attached to the CAD Report into compact disc form and submitted it to the Court. This

compact disc does not contain information that will enable McClelland "to demonstrate that he is

. . . entitled to relief." *Bracy*, 520 U.S. at 908-09 (quotation omitted). The contents of the CAD

Report of Transmission pertain only to the Fourth Amendment issues litigated at the suppression

hearing in McClelland's case. As set forth above in the Factual Background and Procedural

History, and as discussed further below in this Decision and Order, the state courts considered his

Fourth Amendment claims in depth and explicitly determined the propriety of his arrest and the

statements and property obtained as a result of the search and seizures. Because McClelland  had

a full and fair opportunity to litigate his Fourth Amendment claims in state court, he is not

entitled to have this habeas court conduct a *de novo* factual review of them. Because the CAD

Report of Transmission pertains only to McClelland's Fourth Amendment issues, which cannot

form the basis for habeas relief, McClelland has not demonstrated "good cause" for having

Respondent or the Court incur the cost of transcribing the compact disc. Accordingly,

McClelland's request in his second reply affidavit for a "transcribed copy" of the compact disc

---

[2]	The remainder of the affidavit rehashes McClelland's arguments as to why his suppression motion was erroneously decided. At the end of the affidavit, McClelland suggests that because there allegedly is no indication of "operator assignment" for the "time period of 5:10;23 [sic]" in the "Call-For-Service Inquiry Response", this omission "raises the question of whether respondent has suppressed favorable evidence . . . ." McClelland does not explain the rationale behind this statement.

submitted in connection with Respondent's opposition affidavit is denied. *Accord, e.g., Crispino v. Allerd*,  378 F. Supp.2d 393, 414 & n. 5(S.D.N.Y. 2005).

## IV.    Limitations on Habeas Relief

It is well-established that a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *see generally* 28 U.S.C. § 2254(a).

When a petitioner "in custody pursuant to the judgment of a State court" seeks habeas review of a constitutional "claim that was adjudicated on the merits in State court," a habeas writ may issue only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2). A state court decision is "contrary to" federal law as determined by the Supreme Court if either (a) "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law," or (b) "the state court considers facts that are materially indistinguishable from a relevant Supreme Court case and arrives at an opposite result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).  An "unreasonable application" of clearly established federal law occurs if (a) "'the state court identifies the correct governing legal rules from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case,'" or (b) the "state court invokes a Supreme Court case and unreasonably extends its legal principle to a new context where it should not apply, or fails to extend it where it should apply."

*Williams*, 529 U.S. at 407.

Factual findings by a state court are entitled to a presumption of correctness, 28 U.S.C. § 2254(e)(1), which the habeas applicant bears the burden of overcoming by clear and convincing evidence, *id.*

## V.      Analysis of the Claims Raised in the Petition

### A.      Ground One: Unreasonable Search and Seizure

As Respondent argues, the alleged violation of Petitioner's Fourth Amendment rights is not cognizable on federal habeas review under the doctrine articulated in *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), in which the United States Supreme Court held that "where the State has provided an *opportunity* for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 481-82. (emphasis added). In *Gates v. Henderson*, 568 F.2d 830 (2d Cir.1977) (en banc), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978)), the Second Circuit articulated the following "litmus test" for determining when a petitioner has denied an "opportunity" for a "full and fair litigation of his fourth amendment claims[,]" *Gates*, 568 F.3d at 839: In light of the Supreme Court's holding in Powell that the state is only required provide the "opportunity" to the state prisoner for a full and fair litigation of the Fourth Amendment claim, review of Fourth Amendment claims presented by habeas petitioners would be undertaken in only one of two instances– either the State provided no corrective procedures at all to redress the alleged Fourth Amendment violations, or the defendant was precluded from using the corrective process because of an "unconscionable breakdown in

the underlying process". *Accord Graham v. Costello*, 299 F.3d 129, 134 (2d Cir.2002) ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief.... [T]he bar to federal habeas review of Fourth Amendment claims is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim[.]").

Notably, all that must be shown is that the State has provided an *opportunity* to litigate the habeas petitioner's Fourth Amendment claim; it matters not whether the petitioner actually "took advantage of the State's procedure." *Graham*, 299 F.3d at 134. McClelland does not, and cannot contend that New York failed to provide a corrective procedure to redress his alleged Fourth Amendment claim. This is because he took advantage of the opportunity to challenge the legality of his arrest by means of New York's procedure for litigating Fourth Amendment claims, embodied in New York Criminal Procedure Law § 710.10 et seq., which has been held by federal courts in New York to be "'facially adequate.'" *Capellan*, 975 F.2d at 70 n. 1 (quoting Holmes v. Scully, 706 F.Supp. 195, 201 (E.D.N.Y.1989) and citing Gates, 568 F.2d at 837 & n. 4; Shaw v. Scully, 654 F.Supp. 859, 864 (S.D.N.Y.1987)).

Rather, McClelland asserts that the state courts erroneously decided his motion to suppress, and he essentially is asking this Court to conduct a *de novo* factual review of his claims. The relief requested, however, is expressly forbidden by the *Stone v. Powell* doctrine. As the Second Circuit has explained many times, a petitioner's mere dissatisfaction or disagreement with the outcome of a suppression motion is not sufficient to establish that an "unconscionable

breakdown" occurred in the existing process in violation of the petitioner's Fourth Amendment rights under the Constitution. *Capellan*, 975 F.2d at 71 ("[T]o the extent that [petitioner] claims that the Appellate Division erred in its ruling . . . , this would not give us authority to review his claims since a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process."); *Gates v. Henderson*, 568 F.2d at 840 ( *Stone v. Powell* . . . holds that we have no authority to review the state record and grant the writ simply because we disagree with the result reached by the state courts.").

The Second Circuit has explicitly rejected the possibility of interpreting *Stone v. Powell* to require the reviewing court to focus on the correctness of the State court's judicial mechanism for evaluating Fourth Amendment claims, rather than on the existence and application of the corrective procedures themselves. According to the Second Circuit, to subject a habeas petitioner's previously litigated Fourth Amendment claims to further federal review would be to assume, "implicitly at least, that state courts were not responsible forums in which to bring constitutional claims such as is presented herein." *Capellan*, 975 F.2d at 71. The Supreme Court's decision in *Stone v. Powell* does not countenance such an assumption:"[W]e are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States." 428 U.S. at 493-94 n. 35.

Here, as discussed above, McClelland took full advantage of the available State process by presenting his Fourth Amendment claims at both the suppression hearing and in his briefs to the state appellate courts. To the extent McClelland contends that he is entitled to further review of his claims because the trial court's allegedly erroneous fact-finding, incorrect application of

the law, and refusal to consider the pertinent issues during the suppression hearing, constituted an

"unconscionable breakdown" in state process, the Court disagrees, given the circumstances

presented here.

Although the Second Circuit has not defined precisely when an unconscionable

breakdown has occurred, an "unconscionable breakdown" contemplates an extreme disruption or

obstruction of the State's corrective process. As the district court pointedly observed in Cappiello

v. Hoke, "an unconscionable breakdown in the state's process must be one that calls into serious

question whether a conviction is obtained pursuant to those fundamental notions of due process

that are at the heart of a civilized society." *Cappiello v. Hoke*, 698 F. Supp. 1042, 1050

(E.D.N.Y.), *aff'd*, 852 F.2d 59 (2d Cir. 1988) (*per curiam*) (cited with approval in *Capellan*, 975

F.2d at 70; *see also* 975 F.2d at 70 (citing *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y.

1987)).

Clearly, then, a petitioner's mere disagreement with the outcome of the state courts'

rulings "is not the equivalent of an unconscionable breakdown in the state's corrective process."

*Capellan*, 975 F.2d at 72; *accord, e.g.*, *Watkins v. Perez*, No. 05 Civ. 477(GEL), 2007 WL

1344163, at *23 (S.D.N.Y. May 30, 2007) (holding that rejection by state appellate court of

petitioner's Fourth Amendment claims, without more, is not an "conscionable breakdown" in the

state's corrective process; noting that a "habeas court cannot grant relief simply because it may

disagree with the state court's resolution of the claim"); *Woods v. Kuhlmann*, 677 F.Supp. 1302,

1306 (S.D.N.Y. 1988) ("The doctrine of *Stone v. Powell*, however, forbids de novo review of

state court fact-finding on a Fourth Amendment issue particularly where, as here, the petitioner

can claim only that the issue was wrongly decided."); *Huntley v. Superintendent*, No.

9:00CV191, 2007 WL 319846, at *8 (N.D.N.Y. Jan. 30, 2007); *Gonzalez v. Superintendent, Sullivan Corr. Fac.*, 761 F. Supp. 973, 977 (E.D.N.Y. 1991) (rejecting habeas petitioner's claim that state court denied his request for a probable cause hearing insufficient facts asserted to warrant such a hearing was "unconscionable breakdown" in the process afforded by the state; petitioner was provided, as mandated by *Stone*, with a full and fair opportunity to litigate his fourth amendment claim in the state courts and "[t]he fact that petitioner was denied his request for such a hearing does not, in and of itself, affect the legitimacy of the state process").

The crux of McClelland's argument is that Officer Ammerman perjured himself at the grand jury, the suppression hearing, and at trial. When asked by the prosecutor whether, after arresting McClelland, he "came across anything, any burglar's tools or anything of that nature," Officer Ammerman testified at the grand jury as follows: "Yes. The defendant had a flashlight and gloves along with the property he had [in the shopping bags]. Officer Wendy Collier, Officer Ammerman's partner, filed a misdemeanor information which stated that "the gloves were recovered in defendant's left rear pants pocket" and the flashlight was in one of the shopping bags. On cross-examination at the suppression hearing, Officer Ammerman referred to "the gloves and flashlight in the bag" being transported by McClelland on the handlebars of his bicycle. (SH.34). Upon further questioning by the court, Officer Ammerman also referred to "burglary tools" being found "in the property" contained in the shopping bags. (SH.40). At trial, Officer Ammerman testified that the shopping bags (which he searched, after being given express permission to do so by McClelland) contained a flashlight and gloves (in addition to several bottles of perfume and cologne). (T.106, 108). McClelland perceives a discrepancy between Officer Collier's report and Officer Ammerman's testimony with regard to the location of the gloves at the time they were seized from him. From this he argues that Officer Ammerman

perjured himself.

"A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *United States v. Sanchez*, 969 F.2d 1409, 1414-15 (2d Cir.1992); *see also People v. McDaniel*, 81 N.Y.2d 10 (N.Y. 1993). It bears emphasizing that even on direct appellate review of a criminal conviction,  new trials based upon newly discovered evidence indicating perjury are "'granted only with great caution and in the most extraordinary circumstances.'" *United States v. Stewart*, 433 F.3d 273, 296 (2d Cir.  2006) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). McClelland has not come close to demonstrating that Officer Ammerman willfully provided false testimony on a material matter. Notably, McClelland's experienced appellate counsel did not include this "perjury" claim as one of the arguments on appeal. That is because it is plainly without merit.

In the present case, the Court cannot find evidence of an "unconscionable breakdown" of the Fourth Amendment process afforded him. Rather, McClelland can claim only that, in his opinion, the Fourth Amendment issue was incorrectly decided by the state courts. The Second Circuit clearly has held that a petitioner's mere disagreement with the state courts' rulings on his Fourth Amendment issues does not suffice to demonstrate that some type of governmental obstruction amounting to an "unconscionable breakdown" in the state's corrective procedures prevented him from fully and fairly litigating his Fourth Amendment claims. *Capellan*, 975 F.2d at 72. Because McClelland can show nothing more than that he disputes the correctness of the state court's rulings, the doctrine of *Stone v. Powell* forbids de novo review of any state court

fact-finding on such issues.

For all of the foregoing reasons, federal habeas review of McClelland's Fourth Amendment claim regarding the stop of his vehicle and subsequent arrest, and search and seizure, is unavailable under the doctrine of *Stone v. Powell*, *supra*. Accordingly, Ground One must be dismissed.

### B.       Ground Two: Verdict Against the Weight of the Evidence

Petitioner argues, as he did on direct appeal, that the verdict convicting him of second degree burglary was against the weight of the evidence. Specifically, Petitioner contends that the jury failed to take into account that (1) there was no evidence that he entered DuBois's home, and (2) Petitioner was not found in possession of all the property that was stolen from the home. Petitioner reasons that the only logical conclusion is that he found the property as opposed to having stolen it.

In his Memorandum of Law in Opposition to the Petition ("Resp't Mem."), Respondent argues that Petitioner has not overcome the presumption of burglary created by his recent, exclusive and unexplained possession of stolen property and, accordingly, the inference of guilt was reasonably supported. *See People v. Baskerville*, 60 N.Y.2d 374 (N.Y. 1983)).

On direct appeal, the Appellate Division ruled that the verdict finding McClelland guilty of second degree burglary was not against the weight of the evidence. *People v. McClelland*, 35 A.D.3d at 1265 (citing *People v. Bleakley*, 69 N.Y.2d 490, 495 (N.Y. 1987); *People v. Vasquez*, 11 A.D.3d 643, 644 (App. Div. 2d Dept. 2004) ("In the absence of any evidence tending to establish that another person may have committed the burglary and delivered the fruits of the burglary to the defendant, a court is not required to instruct the jury that it could infer that the defendant was a mere possessor of stolen property.  At trial, the defendant failed to produce any

evidence that a different individual committed the burglary and delivered the stolen property to him.") (internal citations omitted)).

As the New York Court of Appeals explained in *People v. Bleakley*,

Although the two standards of intermediate appellate review–legal sufficiency and weight of evidence–are related, each requires a discrete analysis. For a court to conclude, as the Appellate Division did in this case, that a jury verdict is supported by sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged. If that is satisfied, then the verdict will be upheld by the intermediate appellate court on that review basis.

To determine whether a verdict is supported by the weight of the evidence, however, the appellate court's dispositive analysis is not limited to that legal test. Even if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further. If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony. If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict.

*Bleakley*, 69 N.Y.2d at 494-95 (internal citations and quotations omitted).

Respondent argues that McClelland's weight-of-the-evidence claim is not cognizable on federal habeas review. *See Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir 1985) ("A federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight' of the evidence . . . ."), *cert. denied*, 476 U.S. 1123 (1986)). Petitioner, in his Traverse, asserts that his weight-of-the-evidence claims *is* cognizable on federal habeas review. Petitioner argues that under New York law, a weight-of-the-evidence analysis incorporates, as a first step, an inquiry into whether the evidence was legally sufficient–that is, whether a rational trier of fact could have found all of the essential elements of the crime beyond

a reasonable doubt. Petitioner states that under the "second prong", the reviewing court will determine whether the verdict is supported by the "weight of the evidence." Petitioner's Traverse ("Trav.") at 17-18 (citations omitted). Petitioner characterizes these two standards as having "modest differences" and argues that habeas review of his weight-of-the-evidence claim is not only permitted but required.

Petitioner's argument, although creative, cannot carry the day. The "weight of the evidence" claim asserted here derives from New York Criminal Procedure Law ("C.P.L.") § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. CRIM. PROC. LAW § 470.15(5). Thus, a "weight of the evidence" argument is a pure state law claim grounded in the criminal procedure statute, whereas a legal sufficiency claim is based on federal due process principles. *People v. Bleakley*, 69 N.Y.2d at 495. Since a "weight of the evidence claim" is purely a matter of state law, it is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Estelle v. McGuire*, 502 U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Federal courts routinely dismiss claims attacking a verdict as against the weight of the evidence on the basis that they are not federal constitutional issues cognizable in a habeas proceeding. *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence . . ."), *aff'd*, 263 U.S. 255 (1923); *Garrett v. Perlman*, 438 F. Supp.2d 467, 470 (S.D.N.Y. 2006) (same); *Douglas v. Portuondo*, 232 F.

Supp.2d 106, 116 (S.D.N.Y. 2002) (same). In keeping with this well-settled precedent, McClelland's weight-of-the-evidence claim should be dismissed as not cognizable in this habeas proceeding.

Even if McClelland's claim were considered as a legal insufficiency claim, it is still without merit. His primary contention is that Officer Ammerman's testimony was inherently perjurious. However, a habeas petitioner's contention that a witness' testimony was unworthy of belief is not reviewable in habeas proceedings since credibility determinations are the province of the jury. *See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (dismissing habeas claim because "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; stating that it must defer to the jury's assessments of both of these issues) (citing *United States v. Rosa*, 11 F.3d 315, 337 (2d Cir.1993), *cert. denied*, 114 S. Ct. 1565 (1994); *United States v. Parker*, 903 F.2d 91, 97 (2d Cir.), *cert. denied*, 498 U.S. 872 (1990)). McClelland here is merely repeating arguments attacking the witnesses' credibility his trial counsel already made to the jury as trier-of-fact, who was in the best position to observe the witnesses' demeanor and assess their veracity. It is beyond dispute that a reviewing court must defer to the trier-of-fact's assessments of witness credibility. *E.g.*, *United States v. Vasquez*, 267 F.3d 79 (2d Cir. 2001) ( "The jury chose to believe the witnesses' testimony despite any inconsistencies. We will defer to the jury's assessment of credibility." ) (citing *United States v. Payton*, 159 F.3d 49, 56 (2d Cir.1998) ("Where there is conflicting testimony at trial, we defer to the jury's resolution of the witnesses' credibility. . . .").

As Respondent argues, where the prosecution proves that a larceny was committed and that the defendant was in conscious, recent exclusive possession of the stolen goods, the jury generally is warranted in drawing the inference that the defendant was the thief.  Resp't Mem. at

(citing *People v. Galbo*, 218 N.Y. 283, 290-291 (N.Y. 1916)). The inference of guilt arising from

possession of purloined goods is sufficient to constitute *prima facie* proof of the identity of the

possessor of the stolen property as the perpetrator of the crime. *Id.*  Respondent explains that

Petitioner's argument ignores (1) his admission in front of Officer Ammerman and Carl DuBois

that the property belonged to DuBois (the burglary victim) and (2) his statement to the report

technician at the police booking department that he would only be charged with trespass because

he was not caught inside the house. Petitioner's apprehension two blocks away from the victim's

house in possession of items missing from the burgled dwelling along with Petitioner's

inculpatory statements, are inconsistent with his suggestion that he merely possessed the stolen

property.  Under New York law, in the absence of evidence that someone else may have

committed the burglary, the inference of Petitioner's guilt was  reasonably supported. *People v.

Slater*, 115 A.D.2d 672, 496 N.Y.S.2d 506 (App. Div. 2d Dept 1985) ("Since there was no

evidence tending to indicate that there was any other person who may have committed the

burglary and delivered the fruits to defendant, the court did not err in refusing to charge the jury

that they could also infer that defendant was merely a knowing receiver of the stolen property.

This inference is merely permissive. However, the inference alone may be sufficient to establish

proof of defendant's guilt of the burglary beyond a reasonable doubt unless defendant can show

that under the facts of his case the jury could not rationally draw that inference. Defendant has

not met this burden.") (internal citations omitted), *appeal denied*, 67 N.Y.2d 657 (N.Y. 1986)

(table).

   Drawing all possible inferences that may be drawn from the evidence in the prosecution's

favor; bearing in mind that guilt may be established entirely by circumstantial evidence and that

evidence must not be reviewed piecemeal but, rather, as a whole; and giving due deference to the

jury's assessments of the credibility of witnesses (including Officer Ammerman), a rational trier

of fact certainly could have found the essential elements of second degree burglary beyond a

reasonable doubt.

### C.    Ground Three: Harsh and Excessive Sentence

On direct appeal, Petitioner argued that his sentence of twenty-five years to life as a

persistent violent felony offender under New York Penal Law § 70.08[3] was harsh and excessive.

Petitioner urged the Appellate Division to exercise its statutory authority to discretionarily reduce

the sentence to the statutory minimum–sixteen years. The Appellate Division agreed that the

sentence was unduly harsh and modified the judgment by reducing the term to 20 years to life.

*People v. White*, 35 A.D.3d at 1265.

It is well-settled law that a habeas petitioner's challenge to the judge's exercise of

---

[3]        Penal Law § 70.08 applies to defendants who stand convicted of a violent felony (as defined in
N.Y. Penal Law § 70.02) and have previously been convicted of two or more predicate violent felonies (as defined in
N.Y. Penal Law § 70.04(1)(b)). It requires the judge to sentence a defendant as a persistent violent felony offender
solely upon the court's finding that the defendant has the required number of qualifying predicate convictions. Under
Penal Law § 70.08, "the court *must* impose" an enhanced penalty once it finds that the predicate convictions
occurred, *id.* at § 70.08(2) (emphasis added). Thus, practitioners of criminal law in New York often refer to Section
70.08 as the "mandatory" recidivist statute. Defendants sentenced under Penal Law § 70.08 receive an indeterminate
sentence of imprisonment, the maximum of which must be life. Minimum terms are prescribed by the statute and
vary depending on the grade of the offense of conviction.
        Penal Law § 70.08 has escaped the reach of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000),
and its progeny based upon the Supreme Court's exemption for predicate felony convictions from the Sixth
Amendment jury-trial requirement. *Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact
that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and
proved beyond a reasonable doubt."); *accord Almendarez-Torres*.  *But see Butler v. Curry*, 528 F.3d at 644
(examining the issue of the "outer bounds of the 'prior conviction' exception after *Apprendi*" and explaining that
although the Supreme Court has affirmed *Almendarez-Torres*' exception for prior convictions, it "also recognized
that a district court's findings of fact about the basis for a prior guilty plea or conviction at some point 'raise[ ] the
concern underlying . . . *Apprendi*,' that is[,] the Constitution 'guarantee[s] a jury's finding of any disputed fact
essential to increase the ceiling of a potential sentence' ") (quoting *Shepard v. United States*, 544 U.S. 13, 25, 125
S.Ct. 1254, 161 L.Ed.2d 205 (2005)); *Shepard*, 544 U.S. at 27-28 (Thomas, J., concurring) ("[A] majority of the
[Supreme] Court now recognizes that *Almendarez-Torres* was wrongly decided . . . . "[I]n an appropriate case, this
Court should consider *Almendarez-Torres*' continuing viability . . . ."). Habeas courts in this Circuit have held that
the persistent violent felony offender statute "falls squarely within *Apprendi*'s exception for sentence enhancements
based solely on prior convictions." *Antinuche v. Zon*, No. 1:05-cv-01246-ENV, 2010 WL 2035795, at *11
(E.D.N.Y. May 20, 2010) (citations omitted).

discretion in setting the length of his or her prison term does not present a cognizable

constitutional issue if the sentence falls within the statutory range. *See Townsend v. Burke*, 334

U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) ("The [petitioner's] sentence being within

the limits set by the statute, its severity would not be grounds for relief here even on direct

review of the conviction, much less on review of the state court's denial of habeas corpus.");

*White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992) ("No federal constitutional issue is presented

where . . . the sentence is within the range prescribed by state law.") (citing *Underwood v. Kelly*,

692 F. Supp. 146 (E.D.N.Y.1988), *aff'd mem.*, 875 F.2d 857 (2d Cir.1989)); *accord, e.g.*, *Ross v.*

*Gavin*, No. 95-2448,101 F.3d 687, 1996 WL 346669, at *1 (2d Cir. June 25, 1996) (unpublished

opinion). Because Petitioner's sentence falls within the permissible statutory range, his challenge

does not present a constitutional question cognizable in a federal habeas action. Therefore, it is

dismissed.

To the extent that McClelland presents a claim that his sentence violated the Eighth

Amendment's prohibition against cruel and unusual punishment because it was disproportionate

to the nature of the crime, I agree with Respondent that it is unexhausted because he did not

present his challenge to the sentence in constitutional terms on appeal. *See* 28 U.S.C. §§

2254(b)(1)(A); 2254(c) ("An applicant shall not be deemed to have exhausted the remedies . . . if

he has the right under the law of the State to raise, by any available procedure, the question

presented."); *Cox v. Miller*, 296 F.3d 89, 99 (2d Cir. 2002) ("To exhaust a federal claim, a

petitioner must 'fairly present[ ]' to the state courts the 'substance' of that claim.") (quoting

*Anderson v. Harless,* 459 U.S. 4, 6 (1982); other quotation and some internal quotation marks

omitted).

Petitioner's appellate brief presented his sentencing claim in terms of state law, invoking

the power of the Appellate Division to reduce his sentence in the interest of justice under C.P.L.

§ 470.15(b)(b). Respondent correctly argues that this is insufficient to alert the state court that the

claim is of a federal constitutional dimension. *E.g.*, *Polanco v. Ercole*, No. 06 Civ. 1721, 2007

WL 2192054, at *7 (S.D.N.Y. July 31, 2007) (a challenge that a sentence violated the United

States Constitution was unexhausted where no such claim was fairly presented to the state's

highest court); *King v. Cunningham*, 442 F. Supp.2d 171, 181 (S.D.N.Y. 2006) ("The Court finds

King's Eighth Amendment "excessive sentence" claim unexhausted because the constitutional

nature of the claim was not "fairly presented" to the state courts on direct appeal. King's

Appellate Division brief presented his excessive sentence claim in terms of state law, invoking

the power of a state appellate court to reduce sentences in the interest of justice under C.P.L. §

470.15(6)(b). This Court and other courts in this district have found that a prisoner's reliance on

a state procedural law granting courts discretionary authority to reduce sentences does not "fairly

present" his/her constitutional claim in state court.") (citations omitted).

McClelland apparently could raise an Eighth Amendment claim in a C.P.L. § 440.20

motion in Erie County Court because there is no time limit within which to file such a motion,

and more than one motion to set aside a sentence is permissible so long as the ground or issue

raised was not previously determined on the merits in a direct appeal. C.P.L. § 440.20(1)(2).

Thus, I cannot say that an Eighth Amendment claim is procedurally defaulted. *See Mendoza v.

Miller*, No. 9:04-cv-1270 (LEK), 2008 WL 3211277, at *7 (N.D.N.Y. Aug. 6, 2008) (Kahn, D.J.)

(citing *Saracina v. Artus*, No. 04-CV-521S, 2007 WL 2859722, at *7 (W.D.N.Y. Sept. 26, 2007)

(Skretny, D.J. (under C.P.L. § 440.20(3), a state court has discretion to consider a motion in the

interest of justice even where the same issue was determined on the merits in another proceeding

other than a direct appeal); *Reyes v. Phillips*, 02 Civ. 7319, 2005 WL 2173812, at *5 (S.D.N.Y.

Sept. 6, 2005) (because C.P.L. § 440.10(3) and § 440.20(3) were discretionary, the court was not

prepared to hold that petitioner could not return to file a second motion under either section).

However, McClelland cannot demonstrate "good cause" for failing to exhaust an Eighth

Amendment claim earlier in state court. *See Rhines v. Weber*, 544 U.S. 269, 275, 277-78 (2005)

In any event, I note that district courts now have the discretion to dismiss a habeas

petition on the merits notwithstanding the petitioner's failure to exhaust his claims in state court.

*See* 28 U.S.C. § 2254(b)(2); *see also Pratt v. Greiner,* 306 F.3d 1190, 1197 (2d Cir. 2002).

Under any standard of review, I conclude that McClelland does not have an Eighth Amendment

that warrants habeas relief.

The Eighth Amendment prohibits "extreme sentences that are grossly disproportionate to

the crime." *United States v. Snype*, 441 F.3d 119, 152 (2d Cir.) (citing cases) (internal quotation

marks omitted), *cert. denied*, 549 U.S. 923, *reh'g denied*, 549 U.S. 1090 (2006); *see also*, *e.g.*,

*Solem v. Helm*, 463 U.S. 277, 288 (1983). I note at the outset that because a habeas court must

grant considerable deference to legislatively mandated terms of imprisonment, it is "exceedingly

rare" for a petitioner to successfully challenge his sentence. *Ewing v. California*, 538 U.S. 11, 22

(2003) (quoting *Hutto v. Davis*, 454 U.S. 370, 374 (1982) (*per curiam*)); *accord Solem v. Helm*,

463 U.S. at 290 ("Reviewing courts, of course, should grant substantial deference to the broad

authority that legislatures necessarily possess in determining the types and limits of punishments

for crimes, as well as to the discretion that trial courts possess in sentencing convicted

criminals."). Violations of the Eighth Amendment's proportionality clause are found only

'extreme' case." *Lockyer v. Andrade*, 538 U.S. at 73 (quoting *Harmelin v. Michigan*, 501 U.S. at

1001). Indeed, the standard is essentially insurmountable. *See*, *e.g.*, *Lockyer v. Andrade*, 538

U.S. at 77 (holding that petitioner's sentence under California "three strikes" recidivist statute of

two consecutive terms of 25 years to life for stealing approximately $150 in videotapes was not grossly disproportionate in violation of the Eighth Amendment); *Hutto v. Davis*, 454 U.S. 370 (where defendant was sentenced to two consecutive terms of 20 years in prison for possession with intent to distribute nine ounces of marijuana and distribution of marijuana, Eighth Amendment not violated). The Court recognizes that McClelland stole what were essentially worthless items and that he was not found in possession of a weapon and, indeed, no one was at home or harmed during the break-in. However, given the Supreme Court's precedent on this issue, *e.g.*, *Lockyer*, 538 U.S. at 77; *Hutto*, 454 U.S. 370,[4] McClelland's recidivist sentence of 20 years to life for second degree burglary does not approach or exceed the outer limits of what the Supreme Court has determined to be permissible punishments under the Eighth Amendment.

## VI.    Conclusion

For the reasons stated above, Carl McClelland's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because McClelland has failed to make a substantial showing of a denial of a constitutional right, 28 U.S.C. § 2253(c)(2), no certificate of appealability shall issue.

**IT IS SO ORDERED**.

/s/ Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:     April 21, 2011
           Buffalo, New York

---

[4]    I note that *Lockyer* and *Hutto* both come from the Supreme Court's pre-AEDPA jurisprudence.